## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **CYNTHIA RENAYE WALLACE,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:22-CV-0820-X-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge**[1] |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for disability insurance benefits (DIB) under Title II of the Social Security Act should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

## I.    BACKGROUND

Cynthia Renaye Wallace (Plaintiff) filed her application for DIB on August 5, 2020, initially alleging disability beginning on April 25, 2018. (doc. 11-1 at 77, 200, 234.)[2] Her claim was denied initially on October 29, 2020, and upon reconsideration on March 17, 2021. (*Id.* at 78-93, 95-114.) After requesting a hearing before an Administrative Law Judge (ALJ), she appeared and testified at a telephonic hearing on November 2, 2021, during which she amended her alleged onset date to May 23, 2020. (*Id.* at 48, 52, 128-29.) On November 12, 2021, the ALJ found her not disabled. (*Id.* at 15-32.) On December 14, 2021, Plaintiff appealed the ALJ's decision to the Appeals Council, and submitted new evidence dated December 2, 2021, and December 8, 2021.

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 6, 38-47, 197-98.) The Appeals Council denied her request for review on March 11, 2022, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-8.) The Notice of Appeals Council Action explained that the new evidence did not show "a reasonable probability that it would change the outcome of the ALJ's decision." (*Id.* at 6.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on January 28, 1968; she was 52 years old on her amended alleged onset date. (doc. 11-1 at 52, 200, 234.) She had at least a high school education and could communicate in English. (*Id.* at 226, 228.) She had past relevant work as a bank teller, insurance claims representative/insurance agent, and claims adjuster. (*Id.* at 54-59, 228, 245, 301.)

**B.  Medical Evidence**

In 2017, an MRI of Plaintiff's cervical spine showed multilevel cervical spondylosis, no severe spinal canal stenosis, disc protrusions/extrusions at several levels, and potentially noteworthy narrowing of the left C5/C6 neural foramen, more so than to the left at C6/C7. (*Id.* at 799.) A lumbar MRI showed a right foraminal protrusion of disc material at L4/L5 contacting the exiting right L4 nerve root and disc degeneration at L5/S1 with possible thin right eccentric soft disc protrusion abutting the proximal descending right S1 nerve root in a preferentially narrowed right subarticular recess. (*Id.* at 799-800.)

On August 22, 2019, Plaintiff visited Mazahar Salma, M.D. (Internist), at Primary Care Clinic (Clinic), complaining of edema and swelling in the lower extremities. (doc. 11-2 at 648-53.) She weighed 227 pounds, her body mass index (BMI) was 40.2, and she had a normal examination. (*Id.* at 648, 652.) Between November 25, 2019, and March 5, 2020, she returned to Clinic four times. (*Id.* at 739-45, 747-51, 753-57, 759-63.) Her weight and BMI remained around

the same. (*Id.* at 739, 747, 753, 759.) Despite having "reproducible" chest pain in January 2020, and a rash and shortness of breath in February 2020 and March 2020, she had a normal physical examination each time, including normal movement in all extremities and normal gait, station, and muscle strength. (*Id.* at 739, 742-43, 751, 756-77, 762.) She was assessed with morbid obesity and prescribed prednisone and topical ointments. (*Id.* at 744, 751, 757.) In March 2020, she was scheduled for a pulmonary function test. (*Id.* at 744.) At a telehealth visit later that month, she complained of congestion and body aches and was assessed with allergies and primary fibromyalgia; she was instructed on how to treat her symptoms. (*Id.* at 733-37.)

Also on March 5, 2020, Plaintiff visited a psychiatrist, reporting fatigue, rashes, arthralgias, shortness of breath, and asthma. (doc. 11-1 at 704-08.) She weighed 227 pounds, her BMI was 37.8, and she had normal gait, station, and muscle strength and tone. (*Id.* at 706.) At five telehealth visits with her psychiatrist[3], she had a normal physical examination and denied any physical symptoms. (*Id.* at 709, 711, 726, 728, 744, 752-53, 761-62.) In July 2020, she reported "mild" and "improving" insomnia, and she was diagnosed with fibromyalgia. (*Id.* at 726-27.)

On April 3, 2020, a pulmonary function test revealed moderate restriction, mild diffusion impairment, reduced lung volumes, no obstruction, and no response to bronchodilators. (*Id.* at 402.) Her post-bronchodilator FVC was 2.22 liters, her FEV1 was 1.79 liters, and her FEV1/FVC was 81% with a DL/VA of 109. (*Id.*)

On four occasions between June 4, 2020, and August 25, 2020, Plaintiff returned to Clinic. (*Id.* at 445-53, 776-82, 783-89; doc. 11-2 at 719-24.) Each time, she was ambulating normally and had normal gait, station, and muscle strength. (doc. 11-1 at 452, 781, 787; doc. 11-2 at 722-23.)

---

[3] Plaintiff saw her psychiatrist on April 8, 2020, July 1, 2020, August 12, 2020, September 9, 2020, and September 23, 2020. (doc. 11-1 at 709-13, 726-30, 742-46, 750-54, 759-64.)

She weighed around 230 pounds, and her BMI was around 40.7. (doc. 11-1 at 446, 776, 783; doc. 11-2 at 719.) She was assessed with atopic dermatitis and given a dermatology referral at the first visit; at her fourth visit, she reported an upcoming dermatology appointment. (doc. 11-1 at 453, 780-82.) At both visits, she reported "worsening" asthma with fatigue and cough that interfered with her daily activities, but she had not taken any medication for it; she was prescribed inhalers and prednisone for exacerbation. (*Id.*) At her second and third visits, she was prescribed antibiotics for an infection that presented with abdominal tenderness. (*Id.* at 787-88; doc. 11-2 at 722-23.)

At a telehealth visit on August 27, 2020, Plaintiff saw Mei An Tonette Ty Arias, M.D. (Rheumatologist) for an initial evaluation. (doc. 11-1 at 799-803.) She reported a history of degenerative arthritis in her cervical and lumbar spines, and lower back pain that radiated to her right lower extremities and worsened with cold/rainy weather. (*Id.* at 799.) Her diagnosis was affirmed, she was started on pregabalin and a trial of Lyrica, and she was referred for physical therapy. (*Id.* at 802-03.) She declined injections and medications although she had been treated with them in the past, and she was advised she would "eventually" have to consider pain management and neurosurgery if conservative measures did not help her. (*Id.* at 799, 803.)

On September 14, 2020, Plaintiff visited a dermatologist, complaining of joint pain and a mildly severe rash on her head and neck. (*Id.* at 766-68, 796.) She was not treating it with over-the-counter products, although she had in the past. (*Id.* at 766.) Her physical examination was normal except she had erythematous patches and generalized dryness. (*Id.* at 767.) She was diagnosed with xerosis and prescribed topical ointments. (*Id.*)

At a telehealth visit on October 8, 2020, Rheumatologist noted that Plaintiff complained of neck and lower back pain, "hurt[ing] all over", being unable to stand "too long", such as to wash dishes, and sore feet in the mornings. (*Id.* at 791-95.) She had not attended physical therapy

4

because of the "high" co-pay for each session, but Naproxen had helped "a lot" with her pain. (*Id.* at 791.) She had no cardiovascular, pulmonary, gastrointestinal, or neurological symptoms, and she had a full range of motion in her hands and wrists with no swelling, but she had a rash and felt fatigued. (*Id.* at 792-93.) She was diagnosed with degenerative disc disease of the lumbar spine, degenerative arthritis of the cervical spine, and back pain with radiculopathy; she was started on Naprosyn and Methocarbamol. (*Id.* at 793, 795.) She was advised that medication offered "limited benefit[s]" for her type of arthritis, but she again declined neurosurgery and pain management evaluations. (*Id.* at 795.)

On October 28, 2020, state agency medical consultant (SAMC) Jeanine Kwun, M.D., completed a physical residual functional capacity (RFC) assessment based on Plaintiff's medical records. (*Id.* at 86-89.) She limited Plaintiff to occasionally lifting 50 pounds, frequently lifting 25 pounds, standing and/or walking for about 6 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday, unlimited pushing and/or pulling other than with the lift and/or carry weight restrictions, and avoiding concentrated exposure to pulmonary irritants due to her asthma. (*Id.* at 86-87.) She found that Plaintiff's limitations were not fully supported by evidence in the file, (*id.* at 88), and that she could perform work at the medium exertional level, (*id.* at 91-92).

On November 2, 2020, Plaintiff returned to Clinic, complaining of body aches. (*Id.* at 770-75.) She weighed 232 pounds, and her BMI was 41.1. (*Id.* at 770.) She had abdominal tenderness but an otherwise normal physical examination. (*Id.* at 774.) She was assessed with acute cystitis, menopausal symptoms, and mild intermittent asthma. (*Id.* at 775.) She was prescribed ciprofloxacin, montelukast, Bupropion, and Seroquel, and she was started on Cymbalta, "hoping" it would help alleviate her body aches. (*Id.*)

At a telehealth visit on November 24, 2020, Rheumatologist noted that Plaintiff appeared

5

"uncomfortable" and complained of fatigue, chills, and "pain all over". (doc. 11-2 at 498-502.) She was diagnosed with degenerative disc disease of the lumbar spine, fibromyalgia, degenerative arthritis of the cervical spine, and back pain with radiculopathy. (*Id.* at 502.) Her prescriptions of naproxen, methocarbamol, and Cymbalta were extended, and she again declined pain management and neurosurgery referrals. (*Id.*)

On January 8, 2021, Plaintiff visited Clinic, complaining of rashes and difficulty sleeping. (*Id.* at 833-39.) She had a normal physical examination. (*Id.* at 837-38.) Two months later, she returned for an annual physical. (*Id.* at 817-24.) She weighed 234 pounds, and her BMI was 41.5. (*Id.* at 817.) She complained of "worsening", "severe", and "constant" joint pain "everywhere" with no relief, and she had "limited ambulation", "irregular gait", hypotonicity, abnormal motor strength, limited range of motion, and diffuse tenderness. (*Id.* at 820-22.) She was diagnosed with chronic pain syndrome and agreed to pain management. (*Id.* at 820-21, 824.) On April 8, 2021, Plaintiff returned to Clinic, complaining of stomach discomfort and psoriasis lesions with joint pain. (*Id.* at 810-15.) Her weight and BMI had improved, and she had normal gait, station, and motor strength; she also had a pain management appointment the next day. (*Id.* at 810, 814.)

On March 13, 2021, SAMC Laurence Ligon, M.D., completed a physical RFC assessment based on Plaintiff's medical record, concurring with SAMC Kwun's opinions, but he found that her asthma and essential hypertension were non-severe.  (doc. 11-1 at 102, 105-07.)

On May 17, 2021, Plaintiff returned to Rheumatologist, complaining of morning stiffness and pain in her lower back, hip, and hands. (doc. 11-2 at 492.) Her BMI was 38.4, and she had a normal physical examination, but she had erythematous plaque on her scalp, head, and ear. (*Id.* at 493-94.) An examination of 68 joints revealed no abnormality. (*Id.* at 495.) Her Rapid3 score was

22.7 out of 30. (*Id.* at 495-96.)[4] She was unable to walk two or three kilometers, participate in recreational activities and sports, or get a good night's sleep, and her pain was at a level 8 after having been at a level 10 a week earlier. (*Id.* at 496.) X-rays of her sacroiliac joints, wrists, and hands were normal, but she had tenderness with mild swelling in her bilateral trochanteric bursa, wrists, and hands. (*Id.* at 492, 494.) She was diagnosed with polyarthritis, rash, fibromyalgia, degenerative disc disease of the lumbar spine, degenerative arthritis of the cervical spine, and back pain with radiculopathy. (*Id.* at 496-97.) Her prescriptions for naproxen, methocarbamol, and Cymbalta were extended, and she was started on methotrexate. (*Id.* at 497.) She had been to a pain management appointment and had been prescribed Robaxin and naproxen, but her insurance did not cover pain management procedures. (*Id.*)

At a telehealth visit with a psychiatrist on April 1, 2021, Plaintiff complained of arthritis, asthma that was "not problematic", and mild, chronic insomnia that was alleviated by rest and trazodone. (*Id.* at 471-72.) She weighed 225 pounds, her BMI was 37.4, and she had normal gait, station, and muscle strength. (*Id.* at 473-74.)

On June 8, 2021, Plaintiff returned to Clinic for a follow-up, complaining of cough, fatigue, and rashes on her right shoulder. (*Id.* at 801-07.) She weighed 213 pounds, her BMI was 37.7, and her pain level was 8. (*Id.* at 801.) She reported that her sinusitis worsened with environmental exposure; her asthma interfered with her daily activities but had improved, and she was using her inhalers. (*Id.* at 805.) Three months later, she returned for a follow-up. (*Id.* at 792-98) Despite ongoing cough and fatigue, her asthma was still improving. (*Id.* at 796-97.) She still had rashes on

---

[4] "RAPID3 (routine assessment of patient index data 3) is a pooled index of the 3 patient-reported American College of Rheumatology rheumatoid arthritis … Core Data Set measures: function, pain, and patient global estimate of status." Theodore Pincus et al., *RAPID3, an index to assess and monitor patients with rheumatoid arthritis, without formal joint counts: similar results to DAS28 and CDAI in clinical trials and clinical care*, National Library of Medicine, https://pubmed.ncbi.nlm.nih.gov/19962621/#:~:text=RAPID3%20(routine%20 assessment%20of%20patientfor%20a%20total%20of%2030 (last visited Mar. 7, 2023).

her face, scalp, and right shoulder, but her right-hand rashes with joint pain had reportedly improved with medication. (*Id.* at 796, 798.) Her weight and BMI had also improved since the last visit, (*id.* at 792), and she had normal gait, station, and motor strength, (*id.* at 796). Her trazodone prescription for insomnia was refilled. (*Id.* at 797.)

At a telehealth visit on August 19, 2021, Rheumatologist noted that Plaintiff complained of joint pain, fatigue, occasional chills, and a rash. (*Id.* at 485-91.) Her diagnoses and Rapid3 score remained unchanged. (*Id.* at 490-91.) Her muscle relaxer and pain medications were adjusted and/or continued, she would begin Skyrizi treatment for her skin condition the following month, and she was advised to lose weight to alleviate her back pain. (*Id.* at 491.)

On October 20, 2021, Mitch Winn, OTR (Occupational Therapist) examined Plaintiff in person for a functional capacity evaluation (FCE) and found that she could not perform exertional work at the sedentary level. (*Id.* at 575-85.) She reported 6/10 lower back pain, and she had 51 to 81 percent of the "normal" lumbar range of motion. (*Id.* at 576-77.) She was unable to "tolerate" the tests on sitting, standing, dynamic lifting/carrying, and reaching due to severe, right lower back discomfort; she reportedly had the same discomfort during the tests that she did complete. (*Id.* at 575, 578-83.) Plaintiff's heartrate was monitored throughout the evaluation, and Occupational Therapist found that it was "consistent" with a positive 6/10 pain response. (*Id.* at 584.) He noted that her coefficient of variation remained always below the levels of "inconsistent" or "submaximal" effort, and he rated her effort and cooperation as "good". (*Id.* at 575, 578-84.) He cited several sources throughout the FCE summary, including the American Medical Association Guides to the Evaluation of Permanent Impairment. (*Id.* at 577-79, 582.)

The same day, Occupational Therapist completed an arthritis RFC questionnaire, referencing the FCE summary for support. (*Id.* at 586-89.) He opined that Plaintiff could sit 10

minutes at once and less than 2 hours in an 8-hour workday, stand 10 minutes at once and less than 2 hours in an 8-hour workday, walk half a block at once and less than 2 hours in an 8-hour workday; never lift or carry 10 pounds; grasp, turn, and twist objects, perform fine manipulations, and reach in all directions (including overhead) 10 percent of the workday with her right side and 20 percent of the workday with her left side; and rarely twist and never stoop, bend, crouch, squat, or climb ladders. (*Id.* at 587-89.) She would need to walk 3 minutes every 10 minutes, and she would need to take a break about every 10 minutes. (*Id.* at 588.) Occupational Therapist also opined that she would likely miss more than 4 workdays per month. (*Id.* at 589.) He found that her impairments were "reasonably consistent" with her symptoms and functional limitations. (*Id.* at 587.)

On December 8, 2021, Rheumatologist completed a physical RFC questionnaire, noting that Plaintiff weighed about 222 pounds and that her disabling limitations began "approximately" in November 2020. (doc. 11-1 at 39-41.) She could sit, stand/walk, or lie/recline for less than 1 hour in an 8-hour workday; sit or stand for 10 minutes at a time; occasionally lift up to 20 pounds due to "pain, weakness"; and occasionally reach in all directions, handle objects, and perform fine manipulation. (*Id.* at 39-40.) She also required a cane, the ability to alternate positions, being off task more than 15 minutes per hour, frequent breaks, and she would miss 4 or more workdays per month. (*Id.* at 39, 41.)

**C. November 2, 2021 Hearing**

On November 2, 2021, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 48-76.) Plaintiff was represented by an attorney. (*Id.*)[5]

*1. Plaintiff's Testimony*

Plaintiff testified that she was 53 years old, weighed 205 pounds, and was right-handed.

---

[5] The attorney stated that Plaintiff was amending her onset date to May 23, 2020. (doc. 11-1 at 52.)

(*Id.* at 52-53.) She had a high school education and had completed one year of college. (*Id.* at 54.) She had worked as a bank teller from 2006 to 2008; in 2009, she worked in a call center recording requests for mortgage modifications. (*Id.* at 54-55.) She then worked as an insurance agent meeting clients in their homes to sell them policies and submitting any information to the corporate office; she would go into the office if she needed to fax, copy, or print any document. (*Id.* at 56.) At the time, she had a life and health insurance license, as well as an adjuster's license. (*Id.* at 54.) She subsequently worked as a bank teller, cashed checks, and helped customers open accounts; she would sit 5 hours and stand and walk the rest of the workday on a daily basis. (*Id.* at 56-59.) She had not worked or volunteered after leaving her job in May 2020. (*Id.* at 58.)

Plaintiff was still being treated by Rheumatologist. (*Id.* at 59.) There had not been any changes to her rheumatology medication in the previous 6 months. (*Id.*)

Plaintiff had not been recently treated with injections or physical therapy for her neck or back, no surgery had been recommended, and she had not been to the emergency room within the past year. (*Id.* at 60-61.) She took arthritis medication in the form of a pill. (*Id.* at 61.) She would not have been able to stand or walk for 3 hours per workday within the past year, as in her prior bank teller job; she would, however, be able to walk up to one-third of a mile. (*Id.* at 61-62.) She was in "so much pain trying to walk and do [home]exercises." (*Id.* at 62.) She rated her pain at a level 10 even while taking medication; besides her arthritis medication, she took naproxen three times per day, or as needed, and a muscle relaxer three times per day. (*Id.* at 62-63.) She would lie on a heating pad to relieve the pain. (*Id.* at 63.)

Plaintiff could stand or walk for 10 to 15 minutes at most before she began to feel pain in her lower back, hip, and leg. (*Id.*) She could sit for about 20 to 30 minutes before she would "stiffen up" and needed a 3-minute break to get up and move. (*Id.* at 64.) She could lift and carry no more

than about 3 pounds, but she could lift an 8-pound gallon of milk from the refrigerator and carry it to the counter. (*Id.* at 64-65.)

She could not drive 30 or 40 minutes, but she could drive around the block for no more than 10 minutes to get to her medical appointments "right down the street" from her. (*Id.* at 66.) She was able to regularly keep up with her personal care, but it was "hard" and a "chore" for her. (*Id.*) She had stayed in bed "a lot", or about 4 days per week, over the previous year. (*Id.* at 66-67.) She was able to prepare small or quick meals for herself. (*Id.* at 67.) Her husband took care of the household chores. (*Id.*)

On cross-examination, Plaintiff testified that she had pain in both hands and wrists, although more on the right side. (*Id.* at 68.) Her doctors attributed it to arthritis, they prescribed her methotrexate for joint pain and naproxen for swelling, and they advised her to wear a compression glove, which she wore on her right hand. (*Id.* at 67-68.) She had taken Lyrica for fibromyalgia, but she was taken off it because it did not help her. (*Id.* at 69.) She would not be able to live in her house and maintain it all by herself. (*Id.* at 70.) She dealt with chronic pain and stiffness "every day all day". (*Id.* at 71.)

### 2. *VE's Testimony*

The VE testified that Plaintiff had past work as a bank customer service representative (DOT 205.362-026, light, SVP-6)[6], insurance sales agent (DOT 250.257-010, light, SVP-6), bank teller (DOT 211.362-018, light, SVP-5), mortgage modification department customer service representative (DOT 241. 367-014, sedentary, semi-skilled, SVP-5), and claims clerk I (DOT 241.362-010, sedentary, semi-skilled, SVP-4). (*Id.* at 72.)

The VE first considered a hypothetical individual with Plaintiff's age, education, and past

---

[6] DOT stands for Dictionary of Occupational Titles; SVP stands for Specific Vocation Preparation.

work experience who could perform work at the light exertional level, as defined in the regulations, except that she could have frequent but not constant exposure to temperature extremes of cold, and frequent but not constant exposure to pulmonary irritants such as fumes, odors, dust, and gases. (*Id.* at 72-73.) The individual could understand, remember, and carry out simple tasks with short simple instructions; make simple work-related decisions or judgments; maintain attention, concentration and pace sufficient to perform simple work tasks; and have frequent but not constant interaction with coworkers and supervisors. (*Id.* at 73.) The VE testified that the individual could not perform past work, but she could still perform work in the light exertional level, such as a merchandise marker (DOT 209.587-034, unskilled, SVP-2), with 129,000 jobs nationally; mail clerk (DOT 209.687-026, unskilled, SVP-2), with 19,000 jobs nationally; and cashier II (DOT 211.462-010, unskilled, SVP-2), with 569,000 jobs nationally. (*Id.* at 73-74.)

The VE next considered a second hypothetical individual with the same exertional level and limitations as the first hypothetical individual, except that due to pain and a combination of impairments, she would need at least two more 15-minute breaks. (*Id.* at 74.) The individual would not be competitive among coworkers or other applicants for any work. (*Id.*)

The VE's testimony was consistent with the DOT and SCO as well as her education and experience. (*Id.*)

On cross-examination, the VE opined that the individual could not perform the identified jobs at a competitive level if she could sit, stand, and walk less than 2 hours in a workday, or if she was limited to occasional grasping, turning, twisting, and fine manipulation. (*Id.* at 74-75.)

## D.  **ALJ's Findings**

The ALJ issued an unfavorable decision on November 12, 2021. (*Id.* at 15-32.) At step one, she found that Plaintiff had not engaged in substantial gainful activity between her alleged onset

date of May 23, 2020, through her date last insured of December 31, 2025. (*Id.* at 17.) At step two, she found that Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spines, polyarthritis, asthma, obesity, major depressive disorder, generalized anxiety disorder, and PTSD, and the non-severe impairments of hypertension, hyperlipidemia, OSA, and psoriasis; she found that Plaintiff's fibromyalgia and prolapsed uterus were not medically determinable impairments. (*Id.* at 20-22.) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525-404.1526). (*Id.* at 22.) She expressly considered Listings 1.15, 1.16, 3.03, and 14.09. (*Id.* at 22-24.)

Next, the ALJ determined that Plaintiff retained the physical RFC to perform light work, as defined in 20 C.F.R. § 416.1567(b), with some mental and environmental limitations. (*Id.* at 24-25.) At step four, she found, based on the VE's testimony, that Plaintiff could not perform her past work. (*Id.* at 30.) At step five, she found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 30-31.) The ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from the amended alleged onset date of May 23, 2020, through the date of her decision of November 12, 2021. (*Id.* at 32.)

## II.     STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff presents the following issues for review:

1.  Section 404.1520c requires the ALJ to assess the supportability and consistency of opinions from "medical source(s)," including licensed healthcare workers. In this case, the ALJ rejected a functional capacity evaluation and medical opinion because they were not from an "acceptable medical source" and were "based on the claimant's subjective symptoms." Do the ALJ's remarks comply with Section 404.1520c when the evidence was provided by a licensed occupational therapist who attributed his opinion to objective findings rather than Plaintiff's allegations?

2.  A claimant's submission of new evidence requires remand when the evidence raises a "reasonable probability" of changing the outcome. In this case, Plaintiff submitted to the Appeals Council a questionnaire from her treating rheumatologist, who reported disabling limitations similar to those previously reported by her occupational therapist. Does this raise a reasonable probability of changing the outcome when the ALJ rejected the prior opinion, in part, because an occupational therapist was not an "acceptable medical source"?

(doc. 16 at 7.)

### A.  Medical Source Opinion Evidence

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. *Every* medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from h[er] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a).[7] A medical opinion is a statement from a medical source about what the claimant can still do despite her impairments and whether she has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. 20 C.F.R. §§ 404.1513(a)(2),

---

[7] On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a)) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Plaintiff filed her application after the effective date, so the new regulations apply.

416.913(a)(2).

The guidelines provide that the ALJ's determination or decision will explain how persuasive she finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether h[er] finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted). Five factors are considered in evaluating the persuasiveness of medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See* 20 C.F.R. §§ 404.1520c(c)(1), (2), 416.920c(c)(1), (2). The ALJ's determination or decision must explain how she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). She may, but is not required to, explain how she considered the remaining factors. *Id.*

When a medical source provides multiple medical opinions, the ALJ will articulate how she "considered the medical opinions or prior administrative medical findings from that medical

source together in a single analysis using the factors," but she is not required to articulate how she considered each medical opinion or prior administrative medical finding from one medical source individually. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole responsibility for a disability determination rests with her. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

Here, Occupational Therapist physically examined Plaintiff on October 20, 2021, and provided an arthritis RFC questionnaire on her limitations based on an FCE summary. (doc. 11-2 at 575-89.) Plaintiff reported a lower back pain rating of 6/10 throughout the examination; it prevented her from completing the tests evaluating her ability to sit, stand, lift, carry, and reach. (*Id.* at 575-79, 580-81, 583.) Occupational Therapist found that her heartrate was consistent with her subjective pain rating of 6/10 and that her effort was always below the inconsistent or submaximal level. (*Id.* at 575, 578-81, 584.) He also found that she could sit or stand 10 minutes at once and less than 2 hours in an 8-hour workday and walk half a block at once and less than 2 hours in an 8-hour workday; needed to alternate positions and take a break every 10 minutes; could never lift or carry 10 pounds; could never stoop, bend, crouch, squat, or climb ladders, and rarely twist; and could finger, grasp, turn, and twist objects, and reach in all directions 10 percent of the time with her right side and 20 percent of the time with her left side. (*Id.* at 587-89.) He also noted that she would likely miss more than 4 workdays per month and that her impairments were "reasonably consistent" with her symptoms and functional limitations. (*Id.* at 587, 589.)

The ALJ specifically "acknowledged" Occupational Therapist's FCE summary and RFC questionnaire and found them "not persuasive" because:

> [Occupational Therapist's] opinion and findings are based on [Plaintiff]'s subjective complaints and she is specifically noted to have not completed several portions of the

evaluation and was noted [to] complain of severe pains in various areas (14F/10, 8, 6, 5, 2). He is also not an acceptable medical source. However, his findings and opinion were considered with the totality of the evidence.

(doc. 11-1 at 30.)[8]

The ALJ's evaluation of Occupational Therapist's opinion fails to comply with the requirements 20 C.F.R. §§ 404.1520c(b), 416.920c(b). Although she considered it, she "was also required to *explain* how persuasive [s]he found [the] opinion, at least with respect to the factors of supportability and consistency." *William T. v. Comm'r of Soc. Sec.*, No. 6:18-CV-0055-BU, 2020 WL 6946517, at *6 (N.D. Tex. Nov. 25, 2020) (citing 20 C.F.R. § 404.1520c(b)(2)) (emphasis original). The ALJ failed to sufficiently explain "consistency"; she never discussed how Occupational Therapist's opinion on Plaintiff's physical limitations was not consistent with other medical evidence. *See Cardenas v. Kijakazi*, No. 7:21-CV-0135, 2022 WL 2719044, at *7 (S.D. Tex. June 3, 2022), *adopted sub nom. by* 2022 WL 2715204 (S.D. Tex. July 12, 2022) (finding ALJ's failure to expressly address supportability factor "at all" was an error of law). Notably, Rheumatologist's May 2021 treatment note indicated that Plaintiff complained of pain in her lower back, hip, and hands, she was unable to walk two or three kilometers, and she reported having a 10/10 pain rating a week earlier. (doc. 11-2 at 492, 496-97.) Rheumatologist specifically diagnosed her with polyarthritis, fibromyalgia, degenerative disc disease of lumbar spine, degenerative arthritis of cervical spine, and back pain with radiculopathy. (*Id.* at 496-97.) While her physical examinations were generally normal, a May 2021 Clinic treatment note indicated that she complained of joint pain everywhere and had "limited ambulation", "irregular gait", hypotonicity,

---

[8] The parties appear to agree that Occupational Therapist is a "medical source" whose opinion constitutes a "medical opinion", which required an analysis under 20 C.F.R. §§ 404.1520c(b), 416.920c(b), as to its supportability and consistency with the record. (doc. 16 at 14-16; doc. 17 at 4-5.)  As noted, the ALJ is required to "evaluate *every* medical opinion [she] receive[s]," regardless of its source. 20 C.F.R. § 404.1527(c) (emphasis added)

19

abnormal motor strength, limited range of motion, and diffuse tenderness. (*Id.* at 820-22.) In November 2020, Rheumatologist specifically noted that Plaintiff appeared uncomfortable and complained of fatigue, chills, and pain all over. (*Id.* at 498-502.) Because Occupational Therapist's limitations appear consistent with other medical evidence, the ALJ's failure to provide any discussion of the consistency of Occupational Therapist's opinion "makes it impossible to determine whether [she] properly considered and weighed that opinion." *See Cardenas*, 2022 WL 2719044, at *8.

In addition, the ALJ did not expressly address the supportability of Occupational Therapist's opinion, which constitutes an error of law. *See William T.*, 2020 WL 6946517, at *6 ("[T]he [Social Security] regulations do not appear to contemplate a scenario where an ALJ fulfil[l]s h[er] legal obligation to consider a medical opinion without also explicitly discussing how [s]he did so."). While the ALJ's reference to Plaintiff's incomplete examination and her subjective complaints as the basis of Occupational Therapist's opinion could be construed as relating to supportability, she offers no explanation for these statements, and "[t]he ALJ's decision must stand or fall with the reasons set forth in [her] decision, as adopted by the Appeals Council." *Newton*, 209 F.3d at 455 (citations omitted); (doc. 11-2 at 30). Moreover, Occupational Therapist's RFC questionnaire references the FCE summary, which was specifically based on a two-hour physical examination of Plaintiff completed the same day, three times. (doc. 11-2 at 586-89.) The FCE summary, which accompanied the RFC questionnaire, describes the various tests performed (although Plaintiff was unable to complete some), rates her effort as "good" and as always less than the inconsistent and submaximal level, and cites several medical sources. (*Id.* at 775-89.) Although the ALJ may find that an opinion is unsupported by the medical evidence, "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his

position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Because the ALJ only questioned the basis of Occupational Therapist's limitation findings without a substantive discussion of supportability, there is no "discernible logic bridge between the evidence and the ALJ's persuasiveness finding." *Pearson v. Comm'r of Soc. Sec.*, No. 1:20-CV-166-HSO-RPM, 2021 WL 3708047, at *5 (S.D. Miss. Aug. 11, 2021), *adopted by* 2021 WL 3663073 (S.D. Miss. Aug. 18, 2021); *see, e.g., Ramirez v. Saul*, No. SA-20-CV-00457-ESC, 2021 WL 2269473, at *6 (W.D. Tex. June 3, 2021) ("The ALJ failed to build a 'logical bridge' between the evidence on Plaintiff's ability to stand and walk, his rejection of the SAMCs opinions to that effect, and his ultimate determination that Plaintiff suffers from no limitations in this area."). Accordingly, the ALJ erred in failing to adequately explain how he specifically considered the factors of supportability and consistency in deciding the persuasiveness of Occupational Therapist's opinion.

**B.  Harmless Error**

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays v. Bowen*, 837 F.2d 1362, 1363-64 (5th Cir. 1988). "[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. Nov. 28, 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). To establish prejudice that warrants remand, Plaintiff must show that the ALJ's decision might have been different had she properly considered Occupational Therapist's opinion regarding her functional limitations. *See id.* at 816 (citing *Newton*, 209 F.3d at 458).

Here, had the ALJ properly evaluated Occupational Therapist's opinion regarding Plaintiff's limitations, she could have found additional limitations that would have affected her RFC determination, or that precluded her from performing the jobs identified by the VE. The ALJ's error was not harmless because it is not inconceivable that she would have reached a different decision had she found Occupational Therapist's opinion as to Plaintiff's physical limitations persuasive. *See Ramirez*, 2021 WL 2269473, at *7 (concluding reversal and remand was required where ALJ failed to explain the persuasiveness of medical opinions as to standing and walking limitations as it was impossible to determine whether ALJ's decision was supported by substantial evidence); *Cardenas*, 2022 WL 2719044, at *8 (concluding that ALJ's failure to sufficiently explain his consistency and supportability findings was prejudicial and required remand). Remand should be required on this basis.[9]

## IV.    CONCLUSION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

**SO ORDERED** on this 20th day of March, 2023.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[9] Because the ALJ's determination of Plaintiff's RFC on remand will likely affect the remaining issue, it is not addressed.

## INSTRUCTIONS FOR SERVICE AND
## <u>NOTICE OF RIGHT TO APPEAL/OBJECT</u>

   A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE